Kevin J. Nash, Esq.
Goldberg Weprin Finkel Goldstein LLP
*Attorneys for the Senior Mortgage Lender*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                                        Chapter 11

SPL Partners LLC,                                                 Case No. 121-42248 ESS

                                       Debtor.
-------------------------------------------------------------x

**SENIOR LENDER'S MOTION TO (i) EXCUSE THE
RECEIVER'S COMPLIANCE WITH THE TURNOVER PROVISIONS
OF THE BANKRUPTCY CODE OR ALTERNATIVELY APPOINT AN
OPERATING TRUSTEE; AND (ii) TO APPROVE PROTECTIVE ADVANCES
AND USE OF CASH COLLATERAL TO MAINTAIN THE PROPERTY**

**TO THE HONORABLE ELIZABETH S. STONG,
UNITED STATES BANKRUPTCY JUDGE:**

        Signature Lien Acquisitions III LLC (the "Senior Mortgage Lender"), as the holder of a duly perfected first mortgage lien and assignment of rents, hereby moves (i) to excuse Gregory LaSpina, the state court receiver (the "Receiver"), from complying with the turnover provisions of the Bankruptcy Court or, alternatively to appoint an operating trustee pursuant to 11 U.S.C. §1104; and (ii) to approve protective advances by the Senior Mortgage Lender and use of cash collateral to maintain the Property (defined below), represents and shows this Court as follows:

**Preliminary Statement**

        1.     This bankruptcy case was initially commenced as an involuntary filing on August 31, 2021 by a group of unsecured creditors and lenders of SPL Partners LLC (the

"Debtor"). The Debtor thereafter consented to proceeding under the Chapter 11 of the Bankruptcy Code pursuant to written consent dated October 8, 2021 (ECF No. 13). An Order for Relief has since been entered on October 26, 2021 (ECF No. 16).

2. With the case now proceeding in Chapter 11, the Senior Mortgage Lender has contemporaneously herewith filed a secured claim in the total sum of $20,680,550.01, and is hereby moving to either (i) maintain the Receivership and excuse compliance from the turnover provisions pursuant 11 U.S.C. §543(d) or (ii) alternatively to appoint an Operating Trustee pursuant to 11 U.S.C. §1104. In conjunction with such relief, the Senior Lender is also prepared to make protective advances as a means of *de* facto DIP Financing under 11 U.S.C. §364(c) and (d), and allow use of cash collateral pursuant to a budget.

3. The genesis for this Motion is that the Property badly needs third-party professional management, and the pending Receivership should be continued, failing which, an Operating Trustee should be appointed.

4. The Receiver was first appointed on July 14, 2021 by the Hon. Justice Lawrence Knipel in connection with a pending foreclosure proceeding instituted by the Senior Mortgage Lender in the Supreme Court, Kings County. The foreclosure proceeding was not pre-empted by the COVID-19 moratorium laws. A copy of the State Court Order appointing the Receiver is annexed hereto as Exhibit "A".

5. The Debtor's primary asset is the mortgaged premises known as 9201-9211 4th Avenue, Brooklyn, NY (the "Property" or "Building"), consisting of commercial offices and retail stores, including underground parking.

6. A recent engineer's inspection obtained by the Receiver (annexed hereto as Exhibit "B")[1] (the "Current Property Assessment") indicates that the Property suffered years of neglect and now requires immediate repairs to the structural elements and the cooling system on the roof to prevent ongoing leaks throughout the Building. The lack of attention by the Debtor's current ownership's is further evidenced by the fact that the Debtor had its own 2019 damning engineering report (detailing the same type of grave condition) without taking any corrective action. A copy of the 2019 report is annexed hereto as Exhibit "C.

7. When the mortgage was issued by New York Community Bank ("NYCB") in 2017, the Property was occupied by more than twenty (20) paying commercial tenants. Currently there are less than eleven (11) tenants left, some of whom have not paid rent for months and even for more than a year. In fact, only four (4) tenants have tendered rent to the Receiver for October totaling approximately $32,000. The Debtor's August 2021 management report prepared by ACC Real Estate Services, Inc, indicates alarming levels of rent arrears in excess of $1.9 million.[2]

## Background Facts

8. Prior to bankruptcy, New York Community Bank ("NYCB") refinanced the mortgage debt against the Property in the original principal amount of $16.4 million in 2017, pursuant to a certain Amended and Restated Mortgage Note dated as of May 22, 2017, a copy of which is annexed hereto as Exhibit "E" (the "Note"). The Note is secured by a Consolidated First Mortgage and Security Agreement dated March 22, 20217, recorded in the office of the

---

[1] The Report is too voluminous to download onto the Court's ECF docket, but is available upon email request to knash@gwfglaw.com.

2 The August 2021 Management Reports for the period ending July 2021, annexed hereto as Exhibit "D", indicate $1,987,500 in uncollected ("aged") rental income.

3

City Register on May 31, 2017 in CRFN 20170002000593 (the "Consolidated Mortgage"), a copy of which is annexed hereto as <u>Exhibit</u> "F". The refinancing was done in 2017 to pay off a defaulted loan at the time and provide capital to address needed maintenance and repairs.

### The Debtor's Defaults and Prior Forbearances

9. The Note and Mortgage fell into default on April 1, 2020, and became subject to two separate forbearance agreements, conditioned upon the Debtor's compliance with its ongoing obligations under the Note and Mortgage. As events unfolded, the Debtor defaulted under both forbearance agreements and has not made any meaningful payment since April 2020.

10. The first forbearance required the Debtor to resume regular amortization payments (principal and interest) by October 1, 2020. The Debtor failed to comply with this obligation and then requested a second forbearance calling for interest only payments. However, the Debtor defaulted on that agreement as well, leading to the acceleration of the entire debt and commencement of foreclosure proceedings earlier this year.

11. Pursuant to Section 12 of the Note, the offer of a forbearance does not constitute a waiver of the underlying default and "shall not be a waiver of or preclude the exercise of that or any other right or remedy".

12. Section 13 of the Note further provides for waivers in favor of the Lender of "[p]resentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness are waived by Borrower and all endorsers, guarantors and indemnitors".

13. The effect of the waivers under Sections 12 and 13 is to render the default immediate and direct against the Debtor and all guarantors. Consistent with the foregoing,

Section 6 of the Note permits the Lender to accelerate upon an Event of Default without notice or demand[3] "regardless of any prior forbearance".

14. In fact, the Debtor was guilty of ongoing defaults predating the COVID-19 pandemic by failing to maintain the Building, allowing for hazardous conditions to persist, misappropriation of funds, self-dealing, failure to maintain required debt service ratios under the loan agreements and more. The Debtor simply used the COVID-19 pandemic as a convenient excuse to mask years of mismanagement and misappropriations of funds. For example, the July 2021 Management Report reflects base rent arrears in the sum of $1,544,155.19 and over $200,000 in other rent charges in arrears. Additionally, the July 2021 Management Report reflects only 50% of the rentals being collected and questionable "selling" commissions in excess of $160,000.

15. Given the multiple defaults, the entire mortgage debt was accelerated by NYCB on March 9, 2021 and default interest became due as of the original date of default on April 1, 2020.

16. In the meanwhile, NYCB sold and assigned the Note and Consolidated Mortgage to the current Senior Mortgage Lender, which instituted a foreclosure action on May 25, 2021 in the Supreme Court, Kings County, Index No. 512538/2021 (the "Foreclosure Action"). A copy of the assignment of mortgage is annexed hereto as Exhibit "G".

---

[3] *Rajic v. Faust*, 165 A.D.3d 716, 719, 85 N.Y.S.3d 470, 475 (2018).

## Poor Property Conditions

17.     The Property is in deteriorating condition, and requires immediate attention. In recent years, the Debtor's became plagued by internal dissension, leaving the Property dysfunctional and unable to meet a host of financial and operating challenges.

18.     The report obtained by the Receiver identifies a number of urgent and hazardous conditions at the Building which require immediate attention, including:

- The parking garage shows signs of significant rust and deterioration, and sections of the garage decking require immediate replacement.

- Reapplication of spray fireproofing at garage structure where fire proofing has deteriorated.

- Infra-red scan of the roof structure to be conducted to determine if the decking has sustained any residual damage.

- Facade inspection and repairs in accordance with Local Law 11 Cycle 9.

- Roof replacement.

- Replacement of cooling tower.

- Repair of leak at incoming sprinkler service.

- Elevator modernization.

- Build-out and refurbishment of all interior finishes damaged by water penetration from faulty water tower and roof.

## Relief Requested

### A. The Receiver Should be Excused from A Turnover or an Operating Trustee Should be Appointed

19.     The Debtor consented to the involuntary filing and, upon information and belief, intends to consent to the continuation of the Receivership, which is otherwise warranted even without the Debtor's consent. If the Receiver is not continued, however, then the Senior Mortgage Lender hereby seeks the appointment of an operating trustee pursuant to 11 U.S.C.

§1104(a)(1) for cause, due to incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or 11 U.S.C. §1104(a)(2) as being in the best interests of creditors.

20. Generally, 11 U.S.C. §543(b) provides that the Receiver, as a "custodian" within the meaning of the Bankruptcy Code, must turnover property of the Debtor's estate upon entry of an Order for relief. However, the rule is not immutable, and in appropriate circumstances, the Court may excuse the Receiver's compliance pursuant to Section 543(d)(1), which provides that:

> After notice and hearing, the bankruptcy court—
> (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property.

21. This case presents the precise situation where a turnover is not appropriate. In fact, the interests of creditors are far better served by continuation of the Receivership to ensure that the Building remains under the stewardship of an objective third party. History shows that current ownership let the Building deteriorate, has little or no tenant support or confidence, and has shown no intent or resources to remediate current conditions (as proven by the failure to address the 2019 engineer's report).

22. Additionally, the Debtor had misaligned priorities (as indicated in the litigation between the partners) and lacks capital to support operations. Accordingly, the Court should exercise its discretion to excuse the Receiver from turnover "in the interests of creditors." 11 U.S.C. §543(d)(1) is "intended to provide flexibility when there is no useful purpose to be served by turnover." *In re Plantation Inn Partners*, 142 B.R. 561, 564 (Bankr. S.D. Ga. 1992); *In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995).

23. To determine whether to excuse a turnover under Section 543(d)(1), courts consider several factors, including: (1) whether there will be sufficient revenue to fund a successful reorganization; (2) whether the debtor will use the property for the benefit of the creditors; (3) whether there has been mismanagement by the debtor; and (4) whether there are preferences which a receiver is not empowered to avoid. *In re Lizeric Realty Corp., supra*, 188 BR. at 506-07. *See, also In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991); *In re CCN Realty Corp.*, 19 B.R. 526, 528-529 (Bankr. S.D.N.Y. 1982).

24. Importantly, the focus of the second factor is the interests of creditors, and not the Debtor. *In re Dill*, 163 B.R. 221, 226 (E.D.N.Y. 1994) ("The interests of the debtor, however, are not part of the criteria considered when applying section 543(d)(1)"). At this point, prior management does not appeal financially or operationally capable of addressing the pressing issues confronting the Property, particularly in a Covid-19 environment. *See, In re Dill, supra*, 163 B.R. at 226 (mismanagement established when secured creditor had to subsidize the repair and maintenance of the Properties, and that there was mismanagement of the Properties."); *In re Lizeric Realty Corp., supra*, 188 B.R. at 506-07. But even if the Debtor's principals resist, the balance of the other factors also favors excusing the Receiver's compliance with the turnover provisions.

**(1)    The Debtor Lacks Sufficient Income to Fund a Successful Reorganization**

25. The Property has drastically reduced income, increased vacancies, high rent arrears, millions of dollars of deferred maintenance with immediate repairs of over $500,000 required to stabilize the Property. Thus, it is highly unlikely for any legitimate lender to consider refinancing the Mortgage and other unsecured debt. Moreover, approximately 1/3 of the current equity holders will not support a refinancing as they, too, have lost confidence in the current

8

management. There is no reasonable prospect that the Debtor will be able to fund a successful reorganization outside of a sale process. In the interim, the Building needs to be stabilized so value does not deteriorate further.

26.  The appointment of a Receiver serves an important function of protecting assets pledged as security for a debt and permits a lender to preserve income and control expenses associated with the operation of the property in question. *Federal Home Loan Mortg. Corp. v. Jerwin Realty Associates*, 1992 WL 390264, \*2 (E.D.N.Y. 1992); *see also First New York Bank for Business v. 155 E. 34 Realty Co.*, 158 Misc.2d 658, 661 (Sup.Ct.N.Y.Co.1993) ("[A] receiver in a mortgage foreclosure action ...is an officer of the court and not an agent of the Senior Mortgage Lender or the owner (whose) duty is to preserve and operate the property within the confines of the order of appointment and any subsequent authorization granted him by the court ....").

27.  These dual purposes are also applicable to this Chapter 11 case, particularly since the Senior Mortgage Lender is prepared to make protective advances to cover operating shortfalls preserve and maintain the Property in accordance with a budget to be prepared by the Receiver.[4]

**B.     The Appointment of an Operating Trustee Should be Considered as an Alternative**

28.  If the Receiver is not continued, the Debtor should be removed from possession in favor of the appointment of the Operating Trustee based on cause and the best interests of creditors. 11 U.S.C. §1104(a) provides in relevant portion that:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the

---

[4] A budget is under discussions and will be filed as a supplement to this Motion.

> United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
> (1) for cause, including . . . incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . or
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

29. "[A]ny one of these [enumerated] causes… mandates appointment of a trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989). "A court may consider both the pre- and post-petition misconduct of the current management when making the determination that 'cause' exists for the appointment of a trustee." *In re Ashley River Consulting*, 2015 WL 1540941 at *10 (*citing Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 644–645 (Bankr. E.D.N.Y. 1980)). "The statute is mandatory and dictates that upon a finding of cause, the court is required to appoint a chapter 11 trustee." *In re Sillerman,* 605 B.R. 631, 642 (Bankr. S.D.N.Y. 2019).

30. Moreover "[e]ven if a court does not find that cause exists to appoint a chapter 11 trustee under section 1104(a)(1), the court may still appoint a trustee under section 1104(a)(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate…" *In re Ancona*, No. 14-10532 (MKV) 2016 WL 7868696 AT *12 (Bankr. S.D.N.Y. Nov. 30, 2016) (*citing* 11 U.S.C. § 1104(a)(2)). Section 1104(a)(2) "creates a flexible standard and allows the appointment of a trustee even when no 'cause' exists." *In re Ionosphere Clubs Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

31. The Senior Mortgage Lender respectfully submits that, predicated upon all of the foregoing, ample cause exists for the appointment of an operating trustee under either prong of Section 1104(a)(1) or (2), as an alternate form of relief if the Receiver is not continued.

**C.  The Senior Mortgage Lender Should be Authorized to Make Protective Advances as a Means of DIP Financing**

32. Even with the use of cash collateral, the Receiver cannot operate the Property on the strength of rent collections alone. Currently, the Property has an alleged rent roll of $123,104.95 per month. However, $17,500 of the amount stated on the rent roll is from Pizzeria Uno which has not paid rent for over two years and has recently notified the Receiver of its intent to vacate. Two other large tenants, the Jewish Board of Family and Children with a monthly rent of $20,693.05 and the garage operator with a monthly rent of $25,000 have not paid rent for several months. Per the Receiver's October collections as of October 14, 2021, over $73,000 of rent has not been paid by tenants. After adjusting for uncollected rents, the Building had only generated total monthly rents of approximately $32,000.

33. Section 15.3 of the Consolidated Mortgage authorizes the Senior Mortgage Lender to make protective advances, *inter alia*, to preserve or protect the Property, for labor and materials incurred in connection with the Property, and in operating, using, managing, inspecting, maintaining, repairing or constructing the Property. Section 15.3 further provides that all such protective advances are secured by the existing lien on the Property.

34. For purposes of bankruptcy, the Senior Mortgage Lender is prepared to fund necessary advances to maintain the Property and cover operating shortfalls incurred by the Receiver as a *de facto* DIP Facility pursuant to 11 U.S.C. §364(c) and (d).

35. Sections 364(c) and (d) provide, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b)

or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior or senior lien on property of the estate that is subject to a lien.

36. The statutory requirement for obtaining post-petition credit under sections 364(c) and 364(d) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See also In re Crouse Group Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Courts have applied the following three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code:

> (i) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
> (ii) the credit transaction is necessary to preserve the assets of the estate; and
> (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549. As discussed below, each of these elements is satisfied.

37. The Property is already highly leveraged, while the Debtor has no cash reserves and requires new loans in order to maintain the Property. It is virtually axiomatic that the Debtor cannot possibly qualify for unsecured credit given the lack of equity in the Property. Nevertheless, the Senior Mortgage Lender is prepared to provide additional protective advances on the same terms and conditions of the Mortgage, which is not only the Debtor's best option for post-petition financing, but the only real option available and a sound exercise of business judgment. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds* by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon

prudent business judgment); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.)*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

WHEREFORE, the Senior Mortgage Lender respectfully prays for the entry of an Order consistent with all of the foregoing, together with such other relief as may be just and proper.

Dated: New York, New York
       October 29, 2021

> Goldberg Weprin Finkel Goldstein LLP
> *Attorneys for Signature Lien Acquisitions III LLC*
> 1501 Broadway, 22nd Floor
> New York, New York 10036
> (212) 221-5700
>
> By:   /s/ Kevin J. Nash, Esq.